### FRANK G. FOWLER vs. WILLIAM H. MALLORY AND OTHERS.

*M* owned two patents for a mechanical contrivance for steering propellers, and the plaintiff a patent for a device for the same purpose that could be used advantageously with that of *M*, and they agreed that the plaintiff's patent should be assigned to *M*, who should go to England and make an effort to sell the three together, for such price as he should think best, and if they were not sold within one year that *M* should re-assign the plaintiff's patent to him, the plaintiff to be saved from all expense in the matter. If the patents were sold *M* was to pay the plaintiff $8,000; if either or all should be sold for more than $80,000 the plaintiff was to be paid ten per cent on the excess above that sum until the sales reached $150,000, when he was to receive no further percentage. The plaintiff made no warranty of the validity or sal-ability of his patent, and *M* required none. *M* at once went to England and made every reasonable effort to sell the patents together, but it was there discovered, what none of the parties had before suspected, that an English patent older than the plaintiff's, involving nearly the same improvement, rendered his patent wholly unsalable. *M*, find-ing it impossible to sell the three patents together, sold his own patents for about $4,000 in cash and certain stock, of the nominal value of £12,000, but which proved to be of no real value; and within the time limited by the contract he tendered to the plaintiff a re-assignment of his patent, which the latter refused to receive. In a suit on a bond given for the faithful performance of the contract by *M*, it was held that the plaintiff was entitled to recover $8,000, with interest from the time of the sale of his patents by *M*. (Two judges dissenting.)

In a suit on a penal bond only the sum equitably due can be recovered.

The damages were not to be enhanced by the large amount of stock taken by *M* on the sale, as it had proved worthless.

Although *M* had received but about $4,000 for his patents, the plaintiff was held to be entitled to the $8,000, as being the lowest sum which by the contract he was to receive.

[Argued October 27th—decided December 18th, 1885.]

DEBT upon a bond; brought to the Superior Court. Plea, a general denial, with notice. The case was referred to a committee by whom the following facts were found:—

On the 22d day of April, 1878, the plaintiff and William H. Mallory, one of the defendants, signed and duly executed in duplicate the following contract:—

" This agreement made and entered into this 22d day of April, 1878, by and between Frank G. Fowler of Bridgeport, Fairfield County, Conn., of the first part, and William H. Mallory of said town, county and state, of the second part, witnesseth:

" The said Frank G. Fowler for and on account of considerations hereinafter mentioned, and at the special request of said William H. Mallory, agrees to assign, transfer and deliver to the American Propeller Company a certain letters-patent for improvement in steering propellers, numbered 1989, and granted by authority of the Kingdom of Great Britain and Ireland to William Clark in said letters-patent mentioned, and dated May 11th, 1876, as will appear, and duly assigned to said Frank G. Fowler by said William Clark, on the 4th day of October, 1876, as will appear by said assignment duly executed and delivered.

" The said Frank G. Fowler is to assign and deliver said letters-patent to said American Propeller Company, at the request of said William H. Mallory, upon the following terms and for the purposes hereinafter mentioned, to wit:—
To be sold, assigned and transferred to any parties in Great Britain or elsewhere, together with all the rights, privileges, grants and conditions therein contained, for such a sum of money as the said American Propeller Company shall deem advisable; such sale, leasing or grant is to be made by the American Propeller Company and completed on or before

the 22d of April, 1879, and not thereafter. The said letters-patent are to be sold or leased with and in connection with certain other letters-patent, to wit : A letters-patent granted to Alfred Vincent Newton, of 66 Chancery Lane, dated July 4th, 1867, and numbered 1963, a letters-patent granted to Edward Thomas Hughes, of 23 Chancery Lane, dated July 1st, 1874, and numbered 2277, and now owned by said American Propeller Company, and the said letters-patent so owned by the said American Propeller Company, and dated and numbered as aforesaid, are to be sold with the above patent numbered 1989 and dated as aforesaid, and all sold together. And in case said letters-patent are so sold, leased or disposed of at any price within the time aforesaid, then the said Mallory, his heirs, executors, administrators or assigns, are to pay to the said Fowler, his executors, administrators, heirs or assigns, the sum of eight thousand dollars, within six months after the date of such disposal or sale. And in case the aforesaid letters-patent, meaning either or all the said patents, shall be disposed of for a greater sum than eighty thousand dollars, then the said Mallory, his heirs, executors, administrators or assigns, are to pay to the said Fowler, his heirs, executors, administrators or assigns, at the rate of ten per cent., or ten dollars for every hundred dollars, over and above the said eighty thousand dollars, till the amount of such sales reaches the sum of one hundred and fifty thousand dollars, beyond which sum of one hundred and fifty thousand dollars sales the said F. G. Fowler is to receive nothing, or no further percentage. In case no disposition of said letters-patent hereinbefore mentioned and referred to shall be made within the time aforesaid, then the said William H. Mallory, his heirs, executors, administrators or assigns, shall re-assign or cause to be re-assigned the said letters-patent numbered 1989 to the said Fowler, his heirs, executors, administrators or assigns, and restore the same fully and without loss or reservation within three days from the expiration of this contract.

" The said F. G. Fowler is not to be made any loss, cost

or damage for or on account of this agreement; and the aforesaid ten per cent, or one hundred dollars for each one thousand dollars of sales as aforesaid, is to be rated upon gross sales; and the said William H. Mallory is to cause to be rendered to the said Fowler a correct statement from said American Propeller Company, and sworn to by the president thereof before proper authority, of all sales wherein the above percentage is to be computed, when the same shall be required by the said Fowler."

The bond upon which the suit is brought was executed the same day by William H. Mallory as principal, and by the other defendants, George Mallory and I. DeVer Warner, as sureties, and was for the faithful performance of the foregoing contract by William H. Mallory.

On the same day, and after the execution and delivery of the contract and bond, the plaintiff executed and delivered to William H. Mallory, for the American Propeller Company, an assignment to the company of the letters-patent numbered 1989, which Fowler had agreed by the contract to assign to the company.

The American Propeller Company was a corporation duly organized under the joint stock laws of this state, and William H. Mallory was its president and agent, duly authorized to accept for it from Fowler the assignment of the letters-patent, and duly authorized as general agent of the corporation to transact business in its behalf.

Contemporaneously with the delivery by the plaintiff to Mallory of the assignment of the Clark patent, he delivered to Mallory the grant issued under authority of the Kingdom of Great Britain and Ireland to William Clark, and the assignments thereof from Clark to the plaintiff.

At the time of the execution of the contract, bond and assignment, Mallory was on the eve of departure for London, in company with Gen. Joseph R. Hawley, they being agents of the American Propeller Company for the purpose, among other things, of disposing of the letters-patent mentioned in the contract, and for that purpose they took with them the originals of the Clark patent and assignments.

They also took to London, with authority to dispose of the same, the letters-patent described in the contract as letters-patent granted to Alfred Vincent Newton, No. 1963, and letters-patent granted to Edward Thomas Hughes, No. 2277, then owned by the American Propeller Company.

Immediately upon their arrival in London they entered upon the business contemplated by their voyage, and attempted in good faith to dispose of the letters-patent No. 1989, granted to William Clark, in connection with the other letters-patent Nos. 1963 and 2277.

On the 12th of October, 1868, letters-patent under the authority of the Kingdom of Great Britain and Ireland had been granted to one William Moodie, numbered 3122. This letters-patent will be hereinafter referred to as the Moodie patent, and the device or invention thereby patented as the Moodie device or invention, while the letters-patent No. 1989 will be hereinafter referred to as the Clark patent, and the device or invention thereby patented as the Clark device or invention. The defendants claimed that the Moodie patent anticipated the Clark patent, and that the Moodie device and invention were substantially the same as the Clark device and invention.

When Mallory and Hawley began their business in London neither of them had ever heard of the Moodie patent, or of his device or invention; but in consequence of something said to them by one Palmer, with whom they were trying to negotiate for the sale of the patents soon after their arrival in London, they got from the patent office a copy of the Moodie patent and gave it a careful and critical examination.

Up to the time of the discovery by them of the Moodie patent as aforesaid, they had endeavored in good faith to sell all the patents in connection with each other, but by reason of the existence of the Moodie patent and the similarity between the Moodie device and the Clark device, and the possibility that the two devices might be held to be substantially identical with each other, and the knowledge of those facts by themselves and by the parties with whom

they were negotiating, they found it impossible to dispose of the Clark patent.

On the 24th of August, 1878, the American Propeller Company, by Hawley and Mallory acting as its agents and in its behalf, assigned and disposed of the letters-patent numbered 1963 and 2277, to the Mallory Propeller Company, Limited, a corporation duly organized in England; but they were unable, for the reasons aforesaid, to make any profitable use of the Clark patent, and neither they nor the American Propeller Company ever received any proceeds therefrom.

The evidence introduced by the parties respectively upon the question whether the Clark device was or was not substantially identical with the Moodie device included the exhibition of models, from which it appeared that the great feature of each device was a dial-plate with certain lines upon it; the only material difference consisting in the fact that the dial-plate in the Clark device is graduated and numbered, while the dial-plate in the Moodie device is not graduated and numbered; and the un-numbered lines of the Moodie dial-plate are not designed to accomplish, and do not in fact accomplish, the result which the numbered lines of the Clark dial-plate are designed to accomplish and do in fact accomplish. If the dial-plate in the Moodie device were graduated and numbered substantially like the dial-plate in the Clark device, the two devices would be substantially identical with each other for all practical purposes. Without such graduating and numbering of the dial-plate the Moodie device would not enable an officer in a part of the ship distant from the steersman to communicate his wishes to the steersman instantly and intelligibly by quick and short orders, so that the course of the ship could be instantly changed by the steersman in conformity with such orders. With such graduation and numbering of its dial-plate the Moodie device would enable the officer so to communicate his wishes to the steersman, and the steersman so to obey the orders given by the officer. The Clark device, having its dial-plate so graduated and numbered,

accomplishes that result; and the result so accomplished by means of such graduating and numbering of the dial-plate is a result of great practical utility.

If, upon the facts above stated, the law relating to the patentability of inventions is so that said two devices must be held to be substantially identical, then I find them substantially identical; otherwise not.

Of the ten thousand pounds which, in the contract of the Mallory Propeller Company, Limited, with the American Propeller Company, was stipulated to be paid in cash, there was paid to the agents of the American Propeller Company the sum of £1,245 and no more—said payment being on account of the patents and steam launch mentioned in the contract.

In the making of this payment of cash no discrimination was made between that part of it which was to be considered as paid on account of the patents and that part which was to be considered as paid on account of the launch; but I find that Gen. Hawley was entitled, as between him and the American Propeller Company, to ten per cent. of the amount paid for the patents and to no part of the amount paid for the launch, and that thereupon Hawley and Mallory agreed upon the sum of $362.52 as the fair amount due to Hawley out of the total amount of cash paid, which amount so agreed upon was in fact received and retained by him. That settlement was just and fair, and of the total sum of £1,245, $3,625.20 ought to be considered as having been paid on account of the patents and the rest on account of the launch.

Mallory also received as agent of the American Propeller Company, in pursuance of the stipulations contained in the contract with the Mallory Propeller Company, Limited, two hundred and forty shares of the capital stock of that company, which shares were allotted to him as fully paid up shares, and were of the nominal value of fifty pounds each.

These shares never had any other than a speculative value, and never any intrinsic value, and the American Propeller Company never derived any benefit from them.

Mallory returned to this country early in November, 1878, and on the 9th of November, 1878, at his request, the plaintiff met him at the house of George Mallory in Bridgeport. Wm. H. Mallory then in substance told the plaintiff that he had been unable to sell the Clark patent, because the device had been anticipated in the Moodie patent, and also showed to the plaintiff a copy of the Moodie patent which he had brought from England. At this interview the Clark patent, with the assignments of it, was tendered by Mallory to the plaintiff. He refused to receive them, and left them in the possession of Mallory, who, at the same time, gave him notice that they would be held subject to his order.

On the 21st day of April, 1879, Mallory attempted to deliver to the plaintiff a re-assignment of the Clark patent, which re-assignment had been duly prepared and executed in conformity with the provision for such re-assignment contained in the contract, and the delivery thereof would have been made on that day but for the fact that the plaintiff then avoided it. In so avoiding such delivery at that time the plaintiff was not acting in bad faith, but was governed by the purpose of obtaining the advice of counsel upon the question whether he should then receive the delivery of the re-assignment or not. On the following day the re-assignment was put into the hands of the plaintiff by an agent of Mallory. The plaintiff retained the re-assignment until October 27th, 1879, when, at an interview with Mallory on the cars going from Bridgeport to New York, the plaintiff tendered it back again to Mallory, saying in substance that when the document was given to him in April, 1879, he did not know that the patents had been sold or the contract broken. Mallory refused to accept the document, whereupon the plaintiff laid it in his lap and left it there.

At the last named interview the plaintiff made demand upon Mallory for the amount due him under the contract, and for the amount due on the bond; and also made demand for a sworn statement of sales in conformity with the

terms of the contract; the plaintiff claiming at the time to possess proofs that the patents had been sold. In reply Mallory said in substance that the patents had not all been sold; that a stock company had been formed, but a full sale had not been completed, the plaintiff's patent not having been sold.

At that time Mallory was still the president and general agent of the American Propeller Company, and he did not then or at any subsequent time, as president of the company or otherwise, make to the plaintiff any sworn statement of any sales of any of the patents or cause any other person to make such sworn statement; said Mallory did not then or at any other time pay the plaintiff any amount due him under the contract or bond.

On the 30th of October, 1879, and before the commencement of this suit, the plaintiff made demand upon the defendants, George Mallory and I. DeVer Warner, for the amount due him upon the bond, at the same time stating to each of them that he had previously made demand for the amount due upon the bond and contract upon William H. Mallory, and that the latter had upon such demand refused and neglected to pay anything thereon, and that the contract and condition of the bond had been broken; but George Mallory and Warner then refused, and have ever since continued their refusal, to comply with the demand so made upon them; and the plaintiiff has never been paid anything by reason of the contract and bond.

Down to the time of the signing of the contract and bond the plaintiff had never heard of the Moodie patent, and had no knowledge or reason to suppose that the Clark patent had been anticipated or was interfered with by any other patent previously issued in the English patent office or elsewhere; but on the contrary he supposed that the Clark patent was valid, and that the device therein described was protected by it and was new and useful.

The plaintiff did not make any fraudulent representations or statements to William H. Mallory, or to either of the

defendants, concerning the value, utility, novelty or validity of the Clark patent, or of the subject matter thereof.

For some time previous to the execution of the contract negotiations in regard to the sale by the plaintiff of the Clark patent had been carried on between the plaintiff and Mallory, acting in behalf of the American Propeller Company, which negotiations finally resulted in the execution of the contract. During these negotiations Mallory gave the plaintiff to understand that he did not ask him to warrant or guarantee the validity of the Clark patent, and did not expect him to do it, and desired the plaintiff to obtain the opinion of George Gifford, Esq., a patent lawyer in New York, which opinion, in favor of the validity of the patent, the plaintiff thereupon obtained and delivered to Mallory shortly before the execution of the contract.

I further find that the plaintiff made no express warranty of the value, utility, novelty or validity of the Clark patent to Wm. H. Mallory or to either of the other defendants, unless such express warranty is found by implication in the facts hereinbefore set forth.

The Clark patent was originally obtained by William Clark, as the agent of the plaintiff, directly from the English patent office, and was assigned by Clark to the plaintiff on the 4th day of October, 1876.

Wm. H. Mallory died on or about the 8th day of November, 1882, and his administrator has duly entered to defend this suit.

Upon these facts the case was reserved for the advice of this court.

*S. Fessenden* and *F. L. Holt*, for the plaintiff.

1. This was not a bailment, nor do any of the decisions cited by the defendants sustain their claim that it is. The record in this case shows an absolute transfer by the plaintiff of the patent in question to the American Propeller Company, so that the title vested absolutely in the company, and it nowhere appears that there was any bailment created, or that a bailment was even thought of by the

parties. And there was an agreement to re-transfer the patent to the plaintiff provided no sale was made of the patents mentioned within a year from the date of the contract, which shows beyond all question that the company did not hold the patents as bailee, but as absolute owner. This case differs then from all those cited by the defendants, in that, in every one of those cases, the title to the chattels in question did not pass out of the owner, and the parties thus were found, upon the agreements entered into between them, to have had in contemplation a bailment and not a sale. The defendants assume that this is a bailment without authority to support their position, all the authorities agreeing that " wherever there is a transfer of title and delivery of the property on a contract for an equivalent in money, or some other valuable commodity, or the return of the identical thing, it is a sale and not a bailment; hence, if the terms of the undertaking contemplate the payment of money instead of the return of the article or any equivalent, as well as the return of the article itself, the transaction constitutes not a bailment but a sale. This contract does not contemplate a return of the patent, but a re-conveyance of the same; and the recognized doctrine of England and the United States is, that the instant the title in the thing so delivered passes completely over to the new possessor à sale takes effect. Shouler on Bailments, 5; Story on Bailments, §§ 371, 415; Edwards on Bailments, § 415; *Chase* v. *Washburn*, 1 Ohio St., 244; *Crocker* v. *Gullifer*, 44 Maine, 491; *Marsh* v. *Wickham*, 14 Johns., 167; *Hurd* v. *West*, 7 Cowen, 752.

2. Our statute (Gen. Statutes, p. 444, sec. 1), providing that in actions on penal bonds containing conditions which have been broken, such damages only shall be awarded as are equitably due, and judgment shall not be rendered for the whole penalty unless it appears to be due, which the defendants invoke, cannot aid them upon the ground claimed in their brief, for the reason that, if the defendants failed to carry out their contract, and sold their two patents for the amount stated in the record, the sum due us by the

terms of the contract is equitably due, and the damages, to which we are in equity entitled for the breach of the bond, are ascertained and fixed by the contract. That amount is "equitably due" which the parties agreed in advance should be the amount of the damages suffered in the happening of certain events. In the event of the sale of any of the patents for any sum whatever less than $80,000, it was agreed by the parties that the sum to be received by the plaintiff was $8,000. It was further agreed that in the event of the sale of any of the patents for a greater sum than $80,000 there would be due to the plaintiff ten per cent. upon all such sums until the sales reached the sum of $150,000, after which the plaintiff was to receive nothing, or no further percentage. The terms of this contract, therefore, show that the defendants conceded that the sale of either or all of the patents would entitle the plaintiff to receive a sum specifically agreed upon in advance as his compensation therefor. They have, therefore, agreed by this contract that the above sums, in the above events, would be the damages due in our action on this bond. The parties had a right to make the contract which they did make, and to fix beforehand the value of the patent, and agree, as they did specifically, upon the sums which should be paid the plaintiff in the happening of the events therein provided for; and a court of equity would not relieve from such a contract, or make a different contract for the parties, no fraud being shown; but upon the claim of the defendants, if they had sold our patent for five dollars and the others for the remainder of the amount received by them, we would be obliged to prove some other measure of damages than that which the parties fixed and agreed upon in their contract. If *A* enters into a contract to build a house for *B* according to plans and specifications agreed upon between the parties, for a certain sum, and *B* gives a bond to pay the sum upon the completion of the contract, he can not, in an action on the bond, set up, for the purpose of reducing the damages, that he could have procured the building of the house for a less sum than that agreed between him-

self and *A;* and the same rule would hold good upon a sale or contract concerning any species of property. Egglestone on Damages, § 642; 1 Sutherland on Damages, 475, 481–490; Wood's Mayne on Damages, §§ 158, 159, 162, 163, 164, 170; *Grasselli* v. *Lowden,* 11 Ohio St., 349; *Springdale Cemetery Asso.* v. *Smith,* 24 Ill., 480; *Pierce* v. *Fuller,* 8 Mass., 223; *Holmes* v. *Holmes,* 12 Barb., 137; *Dakin* v. *Williams,* 17 Wend., 447; *Bagley* v. *Peddie,* 16 N. York, 469; *Astley* v. *Weldon,* 2 Bos. & Pul., 346.

*J. S. Beach* and *E. W. Seymour,* for the defendants.

The suit is on a penal bond of William H. Mallory, now deceased, and his sureties, in the penal sum of $15,000. The liabilities of the surviving sureties are to be found, if found at all, in the condition of the bond. The condition recites that an agreement of even date therewith has been made between the plaintiff and Mallory, touching the sale by Mallory of certain letters-patent owned by the plaintiff; and that if Mallory shall pay all sums of money that may become due to the plaintiff, if such sale be made, or if the patent be not sold, if Mallory shall restore it to the plaintiff within a prescribed period, the bond shall be void. The patent was an English patent and was to be sold in England. Mallory went at once to London, and the committee finds that he used his best efforts, in good faith, to sell the patent as stipulated. Pending those efforts it was discovered that the plaintiff's supposed invention had been anticipated, that the patent was of no value, and that it was "impossible" for Mallory to sell it at any price. Mallory, within the time prescribed by the contract, restored the patent to the plaintiff in the same condition that he received it.

Upon these facts, nothing more appearing, it cannot be denied that the duties imposed upon Mallory by the contract were those of a bailee of the plaintiff's property, bound in good faith to use his best efforts to sell that property to the best advantage, and if sold to pay over the stipulated price, or if not sold, to restore the property to its owner.

That those duties were fully met and performed by Mallory is not denied. We insist, therefore, that the sureties on this bond are not liable to pay the demanded damages to the plaintiff, for two reasons—first, because he has suffered no damage, and second, because, if he had suffered damage, it was not by reason of any fault or omission of duty on the part of Mallory, the principal on the bond.

But the contract recites that there were two other cognate English patents controlled by Mallory, in connection with which the plaintiff's patent was to be sold, and if so sold he was to receive $8,000. And the plaintiff insists that, although the sale of his patent, either singly or in connection with the other two, was for the foregoing reasons an "impossibility," still, as Mallory sold the other two patents and received therefor $3,000, his sureties must pay the plaintiff the $8,000.

This result is reached under the claim that the agreement referred to in the condition of the bond, rightly construed, was a "pooling contract." Precisely what this term means is not quite clear. Bouvier fails to define it. But the plaintiff explains it after this fashion. He says that as between the owners of such a "pool" the actual value of the respective properties contributed by each "pooler" is an issue foreign to their relative rights in the "pool" itself. A patent, he says, has no more intrinsic value than a lottery ticket. It may, after long litigation, turn out to be valid and valuable, just as a ticket may draw a prize, or the litigation may result in worse than a blank. And it is gravely urged in support of the plaintiff's equity, under this particular "pool," that as Mallory had two tickets and Fowler only one, the chances in the "pool" were two to one in favor of Mallory as against Fowler. The logic of this new theory of equity jurisprudence seems to be that even if Fowler's ticket turns out to be so wrongly numbered, and of such a wrong series as to be excluded from the drawing, yet *non constat* but that if it had been the right number and of the right series it would not have drawn a prize. From these premises the plaintiff concludes that he,

VOL. LIII—28

as one of the "poolers," is entitled to his $8,000, even though his worthless patent was not sold, and not sold because it was worthless.

More than that. This merciless logic pushes the plaintiff still farther beyond the limits of common sense and common honesty, and so far beyond that he demands of these sureties not only $8,000, as his share in the "pool," but such a sum in addition thereto as will make up $15,000, which he says would have been the amount of his claim if the "pool" had been sold for $150,000.

We do not believe that the courts of a state having for its motto " *Qui transtulit sustinet,*" will announce these theories to be its law; if so, it will be new law, and our text writers must add to their index of topics, " the liability of sureties under a pooling contract."

But this agreement was in no sense a "pooling" contract, as such a contract is defined by the plaintiff. Mallory did not under it agree absolutely and without qualification to sell the plaintiff's patent within a year after the date of the agreement. The plaintiff agreed to part, for the period of one year and three days, with his legal title to the patent, upon certain specified terms, and for a certain described purpose. The contract contemplates and provides for three contingencies or possibilities, each prefaced with the phrase " in case of." 1st. " In case of" the sale of all three patents together. 2d. " In case of " the sale of the three patents together or of either without the others. 3d. " In case of " the plaintiff's patent not being sold at all. Under the first the plaintiff was to have $8,000, no matter for what price they were sold. Under the second the plaintiff was to have a certain percentage for sums " over $80,000 up to the sum of $150,000." Under the third the plaintiff was to have his patent restored to him, " fully and without loss or reservation within three days after the expiration of the contract." Doubtless the first of these three contingencies was the one the parties expected would happen. Their mutual interests demanded that it should happen. The committee finds that Mallory promptly and in good faith made every effort to the

end that it should happen. It did not happen for the sole reason that Mallory found it "impossible to dispose of the plaintiff's patent." The plaintiff's patent therefore was not sold, but in pursuance of the agreement was, within three days after the expiration of the contract, "restored to the plaintiff without loss or reservation."

Clearly it is one of those cases in which, from the nature of the contract, it appears that the parties must from the beginning have contemplated the continued existence of the plaintiff's patent as a salable article, a thing which then was and should thereafter continue to be during the period covered by the contract possible of sale, and it being found by the committee that after the execution of the contract, and during the period covered by it, the patent so far ceased to exist as that it was impossible to sell it, there was no such breach of contract as to impose a liability on these defendants.

PARK, C. J. This case depends upon the construction to be given by the following contract, entered into between the plaintiff and the defendant William H. Mallory, on the 22d day of April, 1878. [The contract is fully set out in the statement of facts, *ante* p. 421.]

The plaintiff performed his part of the contract, and the defendant Mallory went to England, taking with him the two letters-patent belonging to the American Propeller Company described in the contract, and the letters-patent belonging to the plaintiff, to perform his part of the contract.

He was duly authorized by the American Propeller Company to do all that he had undertaken to do in the contract, and no complaint is made regarding his efforts to sell all three of the letters-patent together, as the contract required if it could reasonably be done.

But the case finds that it was impossible for Mallory to sell the letters-patent belonging to the plaintiff, owing to the fact that, in the year 1868, letters-patent had been granted to one Moodie under the authority of the Kingdom of Great Britain and Ireland, which anticipated the

plaintiff's letters-patent to a great extent; still, the case finds that the result accomplished by the Fowler patent by means of the graduating and numbering of the dial-plate, which was common to both, was one " of great practical utility."

Mallory sold the two letters-patent belonging to the American Propeller Company, together with a steam launch belonging to the same company, for the sum of £22,000 sterling; of which amount £10,000 was to be paid in cash, and the remainder in the paid up stock of the English company, called the Mallory Propeller Company, Limited. The case finds that only $3,625.25 was received in cash on account of the two letters-patent, and the stock of the company, though delivered and received, proved to be of no intrinsic value.

Mallory tendered to the plaintiff a re-transfer of his letters-patent within the time specified in the contract, but the plaintiff refused to accept the same. The case further finds that neither the plaintiff nor the defendants had any knowledge of the Moodie letters-patent at the time of the execution of the contract, or at any time before Mallory learned of its existence while endeavoring to sell the letters-patent in England.

The plaintiff made no fraudulent representations to either of the defendants concerning the value, utility, novelty or validity of his letters-patent at any time, and during the negotiations which ended in the contract Mallory gave the plaintiff to understand that he did not ask him to warrant or guarantee the validity of his letters-patent, and did not expect him to do it, but desired him to obtain the opinion of a certain patent lawyer of New York regarding its utility and validity, which opinion was obtained by the plaintiff and given to Mallory shortly before the execution of the contract.

The case further finds that the plaintiff made no express warranty of the value, utility, novelty or validity of his letters-patent to either of the defendants at any time, unless such warranty can be inferred from the facts stated.

Fowler v. Mallory.

These are the principal facts of the case, and the question is, do they constitute a cause of action against the defendants?

In giving a construction to the contract which is the basis of this suit, we are to look at it as it appeared to the parties when they executed it. Here were three letters-patent, two of them owned by the American Propeller Company and one by the plaintiff, all relating to the same subject matter—the steering of steam propellers. The company's letters-patent contained plans and descriptions of all the necessary machinery and appliances for the purpose, and the plaintiff's set forth a mechanical operation for setting the machinery instantly and properly in motion as the exigencies of the case in steering such vessels might from time to time require. Often a moment's delay in giving the proper direction to the vessel puts it in great danger, if it does not cause its destruction. These three devices seemed peculiarly adapted to each other, and necessary to make up one perfect system of steering propellers. A vessel that had the company's devices would be in great need of the plaintiff's or a similar device; and the plaintiff's without the company's or similar devices would be useless, and consequently valueless. Hence it must have appeared to the parties to the contract that it would be greatly to the advantage of all concerned to sell the three letters-patent together; for, apparently, by so doing each would enhance the value of the others, and be itself enhanced in value at the same time; the combination would largely increase the value of the whole beyond the aggregate separate value of each. They had heard of no device like the plaintiff's, and as this mode of steering propellers was comparatively new, they must have thought that there was but little if any danger that either of the patents had been anticipated by others. We may safely conclude therefore that the parties to the contract were anxious to pool their patents; were anxious to make common property of the proceeds of their sales in a speculative adventure. They had large profits in anticipation. They talked of sales amounting to $150,000 and

more; and their only trouble seems to have been how they should divide the proceeds of the speculation.

Neither party asked the other to warrant or guarantee the validity, utility, novelty or value of his respective patent or patents. There is no pretence that the plaintiff requested it of Mallory; and the case finds that the plaintiff made none regarding his patent, unless the facts found show it by implication. But none can arise by implication, for during the negotiations for the contract it is found that "Mallory gave the plaintiff to understand that he did not ask him to warrant or guarantee the validity of his patent, and did not expect him to do it, but desired the plaintiff to obtain the opinion of a certain patent lawyer of New York." That opinion was obtained by the plaintiff, and delivered to Mallory shortly before the execution of the contract. How, then, is it possible that there could have been any warranty or guaranty by the plaintiff, express or implied, regarding the validity of his patent?

If nothing had been said on the subject there might have been an implied warranty that his patent was valid, and therefore salable; but here the matter was talked over by the parties, and the defendant told the plaintiff that he did not ask, and did not expect him, to warrant or guarantee the validity of his patent. He wanted the opinion of a certain lawyer, and when that was obtained and presented to him he was fully satisfied. There is no room to claim a warranty, either express or by implication; yea more, what passed between the parties amounted to an agreement that the plaintiff need not warrant the validity or salability of his patent, and that Mallory would take it as it was, and run his own risk regarding its validity and salability. He was expecting that the plaintiff's patent would largely increase the value of his own, besides furnishing great pecuniary profit in its sale. He was willing, therefore, to forego all security of its salability in order to make the contract.

We come now to a consideration of the contract and an ascertainment of what it means.

The contention regarding its construction is confined to three important clauses.   Two of them relate wholly to the plaintiff's share of the proceeds of the adventure, and the other pools the three patents and makes common property of them in the speculation.

It was impossible to forecast what would be the result. The plaintiff's patent might sell the other two, and the other two might sell the plaintiff's; and the combination might sell all, and add largely to the value of all.   So in the first clause it was agreed that the three patents should be sold, leased or disposed of together.

But does this clause mean that under no circumstances any of them could be disposed of without the rest?   If we compare this clause with the one which says—"and in case the aforesaid letters-patent, meaning either or all the said patents, shall be disposed of for a greater sum," &c., we learn that such was not the meaning which the parties gave to the language used.   They intended, and the clause should be so construed, that one or more of the patents might be sold or disposed of, after all reasonable exertions had been made, during a reasonable length of time, under all the circumstances that might be found to exist, to sell or dispose of them together.

This must be the meaning of that clause, or else Mallory violated the contract by selling the company's patents without selling the plaintiff's in the same sale; and well might it be contended that the plaintiff would have an equitable right to share in the proceeds of such a sale to the same extent that he would have had if his own had been included in the sale.   Mallory would be estopped to say that the plaintiff's patent was not included, if he had absolutely bound himself to sell all three of the patents together or sell none of them.

If we have given the correct construction to the first clause, then the contract must be construed in the same way that it would be if the first clause had contained the meaning we have given it, written out in full.

The second clause in controversy immediately follows

the first, and is as follows:—"And in case said letters-patent are so sold, leased or disposed of, at any price, within the time aforesaid, then the said Mallory, his heirs, executors, administrators or assigns, are to pay to the said Fowler, his executors, administrators, heirs or assigns, the sum of eight thousand dollars, within six months after the date of such disposal or sale."

. The words, "so sold, leased or disposed of," refer to the first clause, and mean sold, leased or disposed of as therein described. This reference to the first clause makes it, with the construction that should be given to it, a part of this clause, as much as it would be if it was written out in full in it.

We have seen that the first clause does not mean that the three patents must absolutely be sold together, but that one or more might be sold, after reasonable efforts for a reasonable time had been made to sell or dispose of them together. This construction is in full accord with the meaning which is clearly expressed in the third clause, and with which this clause must be construed.

The third clause immediately follows the second, and is as follows: — "And in case the aforesaid letters-patent, meaning either or all the said patents, shall be disposed of for a greater sum than eighty thousand dollars, then the said Mallory, his heirs, executors, administrators or assigns, are to pay to the said Fowler, his heirs, executors, administrators or assigns, at the rate of ten per cent. or ten dollars for every one hundred dollars, over and above the said eighty thousand dollars, till the amount of such sales reaches the sum of one hundred and fifty thousand dollars, beyond which sum of one hundred and fifty thousand dollars sales the said F. G. Fowler is to receive nothing, or no further percentage."

The language of this clause is clear and admits of but one construction. After saying "the aforesaid letters-patent," it stops and defines the meaning of those words; which was not done in either of the other clauses, though a similar expression was used. "Meaning either or all the

said patents," is its language. This makes the clause read as follows:—" And in case either or all the aforesaid letters-patent shall be disposed of," &c. What room is there for more than one construction of this clause? What foundation is there for the claim, which one of the counsel for the defendants has urged with great persistency, that the words "meaning either or all the said patents," are equivocal; that we are left to conjecture their meaning?

The words render the clause simple and easy to be understood and free from all ambiguity. There is unmistakable evidence that they were written with deliberation, and with full apprehension of their import, to prevent the claim being made, that has been made, that all the patents must absolutely be sold together. It would seem, if language is capable of debarring such a claim, that it has been done here.

Again; it will be observed in relation to the third clause, that no sale of one or more of the patents can come within its limits, unless the amount of the sale shall exceed the sum of eighty thousand dollars, in which case all that the plaintiff could be entitled to recover would be ten per cent. of the amount exceeding eighty thousand dollars and not exceeding one hundred and fifty thousand; so that, if a sale should be made of the plaintiff's patent alone for the sum of one hundred and fifty thousand dollars all that he could be entitled to recover by this clause would be ten per cent. on seventy thousand dollars. And such would be the case if the Mallory patents alone should be sold for the same amount.

But it is said that what the plaintiff would be entitled to receive under the third clause, is in addition to the eight thousand dollars that he would be entitled to under the second clause. The third clause does not so state, but doubtless it should have that construction, for any other would be absurd.

Now, if it be true, as seems to be conceded by the brief of the senior counsel for the defendants, that if the plaintiff's patent had been sold without the Mallory patents, or the

Mallory patents sold without the plaintiff's, for the sum supposed, the plaintiff would be entitled to $8,000 under the second clause and $7,000 under the third clause, would he not be entitled to $8,000 under the second clause if the amount of the sale in the case supposed should not exceed $80,000? Clearly he would be. How could it be otherwise? A sale of one or more of the patents, for a sum exceeding $80,000, it is conceded comes within the second clause as well as the third. How can it come within the second clause unless a sale of one or more patents may be made directly under that clause? It follows, therefore, that the sum of $80,000 was not intended as a limitation below which no sales of patents less than the whole number could be made, but as a limitation up to which the plaintiff could not receive more than $8,000, as the $150,000 is a limitation above which no percentage could be recovered. The plaintiff surrendered all claim to the surplus over $150,000 in consideration of his receiving $8,000 under the second clause, if sales should be made at any price; thus he gave up a possible advantage in one case to counterbalance a possible loss to Mallory in the other. In order to show this clearly, the two clauses were inserted with the plaintiff's compensation for each separate and distinct. If a sale is large enough to come within both clauses, the compensations in both are to be added together. If it comes within the second clause only, then no addition to the compensation of that clause is to be made. Hence it is clear that the phrase, "meaning either or all the said patents," enters into the second clause, and determines the construction to be given to it.

The defendants' construction of the second clause is, that all three of the patents must be sold to entitle the plaintiff to anything; so that if the plaintiff's patent alone had been sold for a large amount, or if it had been found that one of the Mallory patents had been anticipated by some English patent and thereby was rendered wholly unsalable, but the other two patents had been sold together for a large amount, the plaintiff, in either case, could recover nothing under

the contract, for strange indeed would it be that he could recover the percentage compensation of the third clause, when it is conceded by the defendants that the percentage is in addition to the compensation provided in the second clause. Manifestly such construction of the second clause never entered the mind of either party to the contract; and there should be clear and unmistakable language used in the clause to that effect before it should have that construction. Such a construction would make the plaintiff not only an insurer of the salability of his own patent, but an insurer of the salability of both the Mallory patents as well; when at the same time Mallory would run no risk in regard to the salability of either of the patents, but might be a great gainer by such a defect in some one of them, for then he could retain the entire proceeds of the sale, even if the defect was found to be in one of his own patents. There would be no mutuality in the contract upon such a construction, and the claim is clearly untenable.

Another claim is, that the plaintiff's patent must be sold, at all events, in order to entitle him to anything. This claim, likewise, makes the contract a one-sided affair, and deprives it of all mutuality between the parties. According to it, if the plaintiff's patent had been sold alone for $150,000, Mallory would have nine times as much of the proceeds of the sale as the plaintiff, whereas if the Mallory patents had been sold alone for the same amount, the plaintiff would not be entitled to anything. This construction is untenable like the one we have considered; and both tend strongly to show that the construction we have given the second clause is correct.

The case finds that Mallory sold his patents for more than one hundred thousand dollars. How then can the defendants escape paying the amount of compensation provided in the second clause of the contract? We have seen that whatever sales come within the third clause, come likewise within the second clause; and this the senior counsel for the defense virtually admits when he concedes that one or more patents may be sold under the third clause; in

which case, he further concedes, the compensation provided in that clause is to be added to the compensation provided in the second clause, which could not be done unless the sale comes within both clauses.

In this part of the case the defendants contend that, by the terms of the contract, Mallory was merely a bailee of the plaintiff's patent; that he took it to sell with his own, at the greatest price obtainable by the exercise of due diligence and reasonable effort, for the plaintiff's benefit; all which, it is said, the case finds that he did, and made due return of the property to the plaintiff after all reasonable efforts had failed to accomplish the object.

But in what sense can the contract be called a bailment? It is true that Mallory took the plaintiff's property to sell with his own, and was bound to return it if no sales should be made of any of the properties. But each party had an interest, and a right to share in the proceeds of all the sales that might be made of any or all the properties, as we have seen. There was a pooling of the properties for all purposes of the speculative adventure; and the proceeds of all sales were made common property, differing only in the shares which each party would be entitled to receive.

If the plaintiff's property only should be sold Mallory would share in the proceeds to the same extent that he would have done in a sale of one of his own properties for the same amount, and the share of the plaintiff would be the same in both. There would be no difference, in this respect, whichever property was sold. How then can it be said that Mallory, or the Propeller Company, (which in this case we speak of under his name) was simply a bailee of the plaintiff's patent, to sell it for his benefit, and return the same if no sale should be made?

Again; it is claimed that there is a failure of the consideration for the promise in the contract to pay the plaintiff the sum of $8,000, should one or more of the properties be sold, and ten per cent. additional of the excess in the amount of such sales over $80,000 and up to $150,000, owing to the fact, as is claimed, that the Moodie patent

rendered the plaintiff's patent unsalable by anticipating his device.

We have already considered the answer to this claim while considering whether there was any warranty of the validity, salability, utility or value of this device by the plaintiff while negotiating the contract. We there showed that what passed between the parties during the negotiations amounted to an agreement that the plaintiff not only need not warrant the validity or salability of his patent, but that Mallory would take the same running his own risk of its validity and salability. Surely he could do this, and by doing it deprive himself of the right to claim that there was no consideration for his promise on the ground that the patent was invalid when he accepted it.

And further; it will be noticed that the defect claimed is not in the device itself. There is no pretense that it would not accomplish all that was claimed for it. The defect was in the letters-patent only. Had it been inherent in the device, and the device worthless in consequence, then the claim of the defendants might be sound.

The defendants' counsel illustrate their claim by supposing that Mallory was the owner of a valuable horse and Fowler the owner of its perfect mate. The owners supposed their horses would sell together for a much larger sum than could be realized from their separate sale, and could be sold to greater advantage in England than in this country. So they made a similar contract to the one in question regarding the sale of the horses. They agreed that Mallory should take them to England and sell them together as a pair. If the horses should be so sold at any price Fowler was to receive $500. If either or both should be sold for a greater sum than $1,000, Fowler was to receive ten per cent. on the excess of $1,000. Mallory went to England to perform the contract, and while engaged in trying to sell the horses together as a pair, Fowler's horse met with an accident that destroyed its value and rendered it impossible to sell it. Mallory afterwards sold his horse for

the sum of $1,500. The counsel asks, has Fowler any redress?

We answer that we think he would have if the facts were similar in all respects to what they are here. If the owners of the horses, in order to obtain the much larger sum that they expected to get by the sale of the horses together as a pair than could be realized by their sale in any other way, pooled their horses for the speculation, and made the proceeds of all sales of them or either of them common property to be shared by the parties in certain proportions, and it was further agreed that neither party need insure his horse from accidents of any kind, and if an injury should befall either of them it should be borne by both, it would be more like the present case. The supposed case would be more like the case in hand if, instead of the horse being rendered worthless by an injury, we should suppose that Mallory on his arrival in England found so many horses like Fowler's in every respect, with which the Mallory horse could be matched, that the number destroyed the value of the Fowler horse as a match for Mallory's, and entirely frustrated the plan of the parties for the sale of that horse with the other.

It is further said that if Mallory, after becoming satisfied that the Fowler patent could not be sold, had returned home and tendered a re-transfer of it to Fowler, he would have performed his full duty under the contract; and could then have returned immediately to England and have sold his own patents.

This could not have been done if our construction of the contract is correct. We have seen that the contract made common property of the proceeds of all sales of the patents, whether one or more should be sold. Fowler had an interest to the extent of his compensation in whatever sale might be made of the Mallory patents, and Mallory had an interest in whatever sale might be made of the Fowler patent. If Mallory had found it impossible to sell his own patents, but had sold Fowler's for $150,000, he would have had $135,000 of the amount and Fowler only $15,000. Is it

so that when he became satisfied that the Fowler patent could not be sold, but he could sell his own for a large amount, he could deprive Fowler of all right to share in the proceeds by postponing the sale till he could return home and tender a re-transfer of the Fowler patent, and then return and make his sale? We think not. We think Mallory was bound to conduct fairly and treat Fowler as he would treat himself. He was bound to sell either or all the patents, as the case might be, without discrimination, for whatever price was satisfactory to him under all the circumstances of the case.

We fully agree with the defendants, that in actions upon bonds which are given to secure, and be answerable for, the faithful performance of contracts, the plaintiff can recover no more than is equitably due. But here the breach of the bond consists in a refusal by the defendants to pay the plaintiff a sum of money due him on the contract, of which money the bond was given, among other things, to secure the payment. The amount is equitably due, not as unliquidated damages, but as a sum of money promised to be paid in the state of things that existed.

In conclusion we say that, although hardship exists in the case, it results mainly, if not wholly, from the inability of the defendants hitherto to realize the full benefit of their sale. Had Mallory received in cash the twenty-two thousand pounds sterling for which the sale was made, or had the stock of the "Mallory Propeller Company, Limited," been equal in value to what it was received for, and supposed to be worth at the time, and the remaining ten thousand pounds had been paid in cash, we doubtless should not have heard of any hardship existing in the case.

When the contract was executed, so far as any forecast of future events could be made, it would be supposed that the plaintiff would run twice the risk, at least, that some other patent or patents had anticipated and rendered unsalable one or the other of the Mallory patents, than there was that such would be found to be the case in regard to the plaintiff's patent. Mallory had not only double the number, but

it was known at the time that there were other devices intended to produce similar results to his; but nothing of the kind was known in regard to the plaintiff's patent.

Surely the contract imposed no hardship upon Mallory. It is true he agreed to pay the plaintiff the sum of $8,000 if either or all the patents should be sold at any price; still he was not bound to sell at any losing price. The contract left it wholly with him to say what should be the consideration of all sales he might make. "To be sold for such a sum of money as the American Propeller Company shall deem advisable," is its language. Mallory was not only secure from all loss in this respect, but he was entitled to the surplus of all sales over the sum of $150,000. Whatever might be the amount, the plaintiff could have no more than $15,000, nor less than $8,000.

It is found in the case that the stock which Mallory received in part payment for the sale of his patents, never had any intrinsic value, and it is to be laid out of the case.

We advise the Superior Court to render judgment in favor of the plaintiff for the sum of eight thousand dollars, and the interest thereon from the time the amount became due.

In this opinion PARDEE and GRANGER, Js., concurred.

CARPENTER, J., (dissenting). The law favors sureties. All contracts sought to be enforced against them are to be construed with reasonable strictness in their favor. This proposition will not be denied. That it applies to this case cannot be doubted. William H. Mallory, one of the parties to the contract, contracted in fact as surety for the American Propeller Company. He, and two others who were his sureties, signed the bond given to secure the performance of the contract. William H. Mallory being dead, the suit is prosecuted against his sureties as well as against his estate. The case turns mainly on the construction of the contract.

The plaintiff was the owner of a patent, and the American Propeller Company was the owner of two other patents,

all of which were issued by the government of Great Britain and all related to the method of steering propellers. The parties supposed that they could be sold together more advantageously than separately. Hence it was agreed that the plaintiff should assign his patent to the Propeller Company in order that the three patents might be sold to parties in Great Britain. William H. Mallory entered into a personal contract with the plaintiff, in which he undertook that the patents should be sold in one year if practicable; if not, that Fowler's patent should be re-assigned to him. By the terms of the agreement they were all to be sold together. If so sold, no matter for what sum, Fowler was to receive, as his portion of the proceeds, the sum of $8,000. If all or either of them were sold for more than $80,000, Fowler was to have ten per cent. of the excess up to $150,-000. Fowler's patent, without the knowledge of the parties, had been anticipated in Great Britain by the Moodie patent, for which reason it was found impossible to sell it. The other two patents, together with a steam-launch, were sold for the nominal price of £22,000 to a corporation organized in England. Of this sum there was received in cash on account of the patents the sum of $3,625.20. The balance was paid in stock of the English corporations which the committee finds is worthless. At the expiration of the year the plaintiff's patent was re-assigned to him.

Neither the Propeller Company nor Mallory ever received any benefit whatever from the Fowler patent and the transaction occasioned no loss or damage to Fowler. Upon these facts the question is whether the plaintiff is entitled to recover.

The plaintiff claims that he is entitled to recover $8,000 and interest, and that claim is sustained by a majority of the court. The claim appears to me so palpably inequitable and unjust that I cannot assent to it. My views are strengthened and confirmed by a careful re-examination and re-consideration of the questions involved after the decision was made. The contract, after describing the parties and the patents, and providing that the patents shall be sold

together, is as follows: "And in case said letters-patent are so sold, leased or disposed of at any price within the time aforesaid, then the said Mallory, his heirs, executors, administrators, or assigns, are to pay to the said Fowler, his executors, administrators, heirs or assigns, the sum of eight thousand dollars, within six months after the date of such disposal or sale. And in case the aforesaid letters-patent, meaning either or all the said patents, shall be disposed of for a greater sum than eighty thousand dollars, then the said Mallory, his heirs, executors, administrators or assigns, are to pay to the said Fowler, his heirs, executors, administrators or assigns, at the rate of ten per cent., or ten dollars for every hundred dollars, over and above the said eighty thousand dollars, until the amount of such sales reaches the sum of one hundred and fifty thousand dollars, beyond which sum of one hundred and fifty thousand dollars sales the said F. G. Fowler is to receive nothing, or no further percentage." The contract then provides that in case the patents are not disposed of Fowler's patent shall be returned to him, and that he shall suffer no loss or damage on account of the agreement.

Under this contract one of three results was possible: 1st, a sale of all the patents; 2d, a sale of none of them; and 3d, a sale of one or two of them without the other or others. The first contingency is provided for; a sale of all for any price entitles the plaintiff to $8,000. The second—a sale of none of them—entitles the plaintiff only to a re-assignment of his patent. The third—a sale of two of them, not including the plaintiff's, has actually happened. Now what is the provision of the contract in that contingency? Simply that the plaintiff shall receive ten per cent on the amount received in excess of $80,000. But the plaintiff recovers nothing under that clause in the contract, because the amount actually received for the patent sold is but a little more than three thousand dollars.

Will this contract bear such a construction as to give the plaintiff the sum of $8,000 provided for in the first clause? I think not. This was not a "pooling" of the patents, as

I understand the meaning of that term. Neither party became interested as owner in the patent or patents of the other. The proceeds were not to be divided *pro rata*. The plaintiff was first to be paid $8,000 provided all the patents were sold. There was a possibility that all would not bring more than that sum. No matter, the plaintiff takes the whole. Again, it was possible that all might sell for $150,000 or more. In that event the plaintiff was to receive $15,000; and that was to be the maximum of his compensation. All over that sum, or all over $8,000, as the case might be, belonged to the American Propeller Company. That company received the plaintiff's patent simply as bailee. And it is from that point of view that this contract is to be considered. Now these defendants have a right to insist that this contract shall be literally and strictly construed. Construing it according to its plain, unambiguous terms, $8,000 is payable *only* in case all the patents are sold. That being so, the plaintiff is necessarily precluded from receiving that sum if all are not sold. Moreover, a sale of any, less than all, is a contingency expressly provided for in the second clause; and as the sum of $8,000 is not therein named it is excluded by implication. The plain obvious meaning is, that if all the patents are sold, or, possibly, if a part only, including the plaintiff's, are sold, the plaintiff is to receive $8,000. If all or any of them are sold for more than $80,000, he is to receive ten per cent on the excess. There is no excess and his patent has not been sold. Before he can receive $8,000 it is indispensable that his patent should be sold. The consideration for the promise to pay him that sum is, not the right, or the power to sell, nor both combined, but a sale and the receipt of the price. The promise is necessarily contingent. Until there is a sale, with a right at least to receive the price, the promise does not take effect. As that has never happened and cannot happen the promise is inoperative. There is a total failure of the anticipated consideration.

Take another view. When this contract was entered into both parties assumed and believed that Fowler's patent

was not only valid, but that it had a clear field unobstructed by any conflicting patent. The existence of the Moodie patent was then unknown. It turns out that the existence of that patent renders the plaintiff's worthless. It is very clear that the parties were mutually mistaken. They contracted with reference to something which they supposed existed, but which practically did not exist. It is very much like a contract for the sale of a horse which they supposed to be alive, but which in fact was dead; or a ship at sea which the parties supposed to be safe, but which in fact was lost. In such cases the contract is inoperative because the parties were mutually mistaken as to the existence of a material fact. In that view of the case the plaintiff ought not to recover.

Upon what theory then are the defendants held liable? Solely on the ground that Mallory, after he had discovered that it was impossible to sell the plaintiff's patent at any price, sold his own on the best terms he could. And that ground is only rendered tenable by injecting into the second clause of the contract the provision for the payment of $8,000, when the parties had not only failed to put it there but had carefully excluded it. I submit that such a construction falls but little, if any, short of making a contract for the parties.

We judge of principles and policies by practical results. Let us apply that test to the two constructions of this contract. Construed as I construe it, no injustice is done to either party. The plaintiff has had the benefit of an honest and intelligent effort to sell his patent in a foreign country, without trouble or expense to him. The effort failing, his patent has been restored to him in as good condition as it was when he parted with it; while the Propeller Company has only had, as was its right, the avails of its own patents. Both parties doubtless suffered by the existence of the Moodie patent, but neither is held responsible to the other therefor. A contingency arose which the parties had not contemplated and for which they had made no provision My construction leaves them where they left themselves,

and where the law leaves them, with no contract governing the case. The construction which prevails, by a forced and unnatural interpretation applies the contract to that contingency. It in effect interprets the contract as if it contained a clause in substance like this: "If it shall so happen that Fowler's patent is worthless by reason of the existence of another patent, so that it is impossible to sell it, nevertheless if the Propeller Company shall sell its own patents, it shall pay to Fowler the sum of $8,000." It makes the whole loss resulting from the unexpected contingency fall upon the Propeller Company, while the plaintiff bears no part of it. He is in fact in as good a condition apparently as he would have been if the Moodie patent had not existed. It in effect prohibits the company from selling its own patents except upon a forfeiture of $8,000 to Fowler. It makes Mallory to that extent guarantee that Fowler's patent shall be salable and valuable. By some mysterious, I may say miraculous legal transformation, Fowler's patent, the worthless one, is worth more than the three patents combined; for Mallory is compelled to pay more than double the sum he was able to obtain for all of them. Surely a construction which can work out such results must be radically wrong.

In this opinion LOOMIS, J., concurred.